In re V. & M. LUMBER CO., INC.

(District Court, N. D. Alabama, S. D. October 26, 1910.)

(No. 10,266.)

1. VENDOR AND PURCHASER (§ 266*)—LIENS—WAIVER.

Where a vendor's understanding, when he agreed to waive a vendor's lien and sign a deed to certain timber rights, was that it operated only as to innocent purchasers, and he then intended to insist on his lien as between the original parties, with the exception of the right to cut timber on the part of the purchasers or a corporation to be formed by and composed by them to operate a mill, there was no waiver of the vendor's lien as against the vendees, nor as against the estate in bankruptcy of a corporation to which they transferred the property in exchange for stock; the vendees and their wives being the sole owners of the corporation.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 687, 713–750; Dec. Dig. § 266.*]

2. VENDOR AND PURCHASER (§ 266*)—VENDOR'S LIEN—WAIVER.

A conveyance of real estate to purchasers, who, with knowledge and consent of the seller, buy for the purpose of reselling to third persons,

free from incumbrances, is inconsistent with and constitutes a waiver of the vendor's lien.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 687, 713–750; Dec. Dig. § 266.*]

3. CORPORATIONS (§ 428*) — REPRESENTATION — KNOWLEDGE OF STOCKHOLDERS—VENDOR'S LIEN— INNOCENT PURCHASER — CONVEYANCE TO CORPORATION.

Where vendees organized a corporation to exploit certain timber land, and the vendees of the timber, which was subject to a vendor's lien, transferred the timber rights to the corporation in exchange for stock, such vendees and their wives being the sole owners of the stock, the corporation was not an innocent purchaser for value without notice and was not entitled to the timber rights free from liens.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1751; Dec. Dig. § 428.*]

4. BANKRUPTCY (§ 205*)—MORTGAGES BY CORPORATION—EXECUTION—MEETING OF STOCKHOLDERS—AUTHORIZATION.

A corporation's trustee in bankruptcy cannot take advantage of a failure of the corporation to have a mortgage of its assets, authorized at a meeting of stockholders as required by an Alabama statute; the Supreme Court of the state having construed such statutory requirements to be for the exclusive benefit of stockholders.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 205.*]

5. BANKRUPTCY (§ 100*)—INSOLVENCY—ADJUDICATION.

An adjudication of bankruptcy is conclusive of the insolvency of the bankrupt for all purposes of the proceeding.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 60, 131, 141–144; Dec. Dig. § 100.*]

6. BANKRUPTCY (§ 245*)—CORPORATIONS—TRUSTEE—REPRESENTATION.

A trustee of a bankrupt corporation represents its creditors only, and not its stockholders.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 245.*]

7. BANKRUPTCY (§ 205*)—MORTGAGES—DUTY OF TRUSTEE.

A court of bankruptcy, being a court of equity, following the state law, will require a bankrupt's trustee to do equity before permitting him to attack a mortgage executed by the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 205.*]

8. BANKRUPTCY (§ 169*)—SET-OFF—PREFERENCES.

Where a bank discounted a note for the bankrupt and credited the proceeds to the bankrupt's account, the bank was authorized by Bankruptcy Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), to set off against the deposit notes due it from the bankrupt, and the making the such set-off before bankruptcy did not constitute a preference, unless the loan, the proceeds of which constituted the deposit, was made with the prior understanding that such application was to be made.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 169.*]

9. BANKRUPTCY (§ 169*)—DISCOUNT—SET-OFF—PREFERENCES.

A resolution of the directors of a bankrupt, which was furnished to a bank before a loan was made, recited that the money was to be used to take up notes now held by the bank and to meet the obligations of the bankrupt company. Held, that the bankrupt being insolvent at the time, and the bank having reasonable ground for believing a preference was intended, the bank's act in setting off a note due from the bankrupt to it, against the proceeds of the discount, constituted a voidable preference.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 169.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

10. BANKRUPTCY (§ 206*)—PREFERENCE—EVIDENCE—FINDING—INSOLVENCY.

Evidence *held* to require a finding that a bank, when it applied portions of a discount to debts due from a bankrupt to it, had knowledge that the bankrupt was insolvent and that such application was intended to prefer the bank.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 206.*]

11. BANKRUPTCY (§ 206*)—LIENS—ESTABLISHMENT—SURRENDER OF PREFERENCE.

Where, in a proceeding to sell property of a bankrupt free from liens, a bank, which had received a preference, sought only to establish its lien secured by mortgage, and not to prove its claim against the general assets of the estate, the bank was not required to surrender its preference as a condition of asking the court to recognize its lien on the mortgaged property and to receive payment from the proceeds thereof.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 206.*]

12. BANKRUPTCY (§ 206*)—PREFERENCES—LIENS—SALE OF PROPERTY—DISPOSITION OF PROCEEDS.

Where a bankrupt's trustee petitioned for a sale of property free from liens, one of which consisted of a chattel mortgage partially securing a voidable preference, the trustee was not required to pay the mortgagee the full amount of the mortgage and then sue to recover the preference, but could deduct the amount of the preference from the amount payable to the mortgagee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 206.*]

13. BANKRUPTCY (§ 314*)—CLAIMS—ATTORNEY'S FEE.

Where a note of a bankrupt secured by chattel mortgage, and providing for an attorney's fee for collection, was not placed in the hands of an attorney for collection before petition in bankruptcy against the maker was filed, the attorney's fee was not a part of the holder's provable claims.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

14. BANKRUPTCY (§ 206*)—LIENS—ATTORNEY'S FEES.

Where a mortgage of a bankrupt, securing a note providing for an attorney's fee, was not enforced by foreclosure, but was set up as a valid lien in bankruptcy proceedings against the maker, the mortgagee was not entitled to an allowance for any sum for attorney's fees in proceedings for the sale of the mortgaged property free from liens, as the mortgagee would receive its part of the proceeds from the trustee without expense or effort on its part or that of its attorneys, except that which was directed toward showing the validity and amount of its lien; such services not being regarded as having been rendered, either in collecting the note or in foreclosing the mortgage.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 206.*]

In the matter of the bankruptcy proceedings against the V. & M. Lumber Company, Incorporated. On petition of the trustee to sell real estate and determine the validity of liens thereon. Petition granted in part.

N. L. Miller, for petitioning creditors.

Tillman, Bradley & Morrow (M. M. Baldwin, of counsel), for Samuel J. Seay.

A. Leo Oberdorfer and J. K. Dixon, for J. B. Cobbs, receiver of Union Bank & Trust Company.

GRUBB, District Judge. The petition of the trustee was referred to a special master to take the proof and report to the court his find-

ings of fact and conclusions of law, and now comes on to be heard upon the report of the special master.

The facts necessary to a decision of the questions presented by the petition are as follows: Spink and Brewer purchased from Seay certain timber rights in lands for $3,500 and from one Wyatt a sawmill and certain personal property appurtenant to it for $1,400. The two transactions were consummated at the same place and time. Spink and Brewer paid no cash and gave no mortgage or other express lien to secure the purchase money on either trade. Seay claims the retention of a vendor's lien. Wyatt makes no such claim. After the two trades were made, Brewer and Spink organized the bankrupt corporation to take over the property and operate the sawmill. The property so acquired by Brewer and Spink was conveyed to the corporation by them, in satisfaction of a stock subscription of $9,000. The shares were distributed equally between Spink and Brewer, one share of each being issued to their wives as nominal owners. Spink and Brewer, with their wives, were the sole owners of the stock of the corporation at the time of the conveyance to it of the property acquired from Seay and Wyatt. Thereafter the bankrupt corporation executed a note to the Union Bank & Trust Company in the sum of $2,000, providing for an attorney's fee, and secured by a mortgage on all the property acquired from Seay and Wyatt. The proceeds of the mortgage note, which was discounted, were credited to the bankrupt by the bank, and thereafter about $770 of the proceeds were applied to the payment of notes of the bankrupt previously held by the bank, two of which were demand notes, and the third, not yet due. The balance was drawn out by Spink and applied to pay an indebtedness of the bankrupt to him. There has been an adjudication of the bankrupt.

The questions involved in the determination of liens and their respective priority are: (1) As to whether Seay is entitled to a vendor's lien as against the estate in the hands of the trustee; and (2) as to whether the Union Bank & Trust Company's mortgage is a valid lien against the estate in the hands of the trustee as to the whole amount of the note, or only the part not applied by the bank to the existing indebtedness of the bankrupt to it, and whether an attorney's fee is included in the amount secured by the mortgage.

It is conceded that the Union Bank & Trust Company had no notice of any retention by Seay of a lien to secure the purchase money due him, and that the lien of its mortgage, if valid, is prior in right to any Seay may have to secure such purchase money.

The trustee's contention as to Seay's lien is that Seay either expressly or impliedly waived his lien in the transaction with Brewer and Spink, and that, if his lien was not waived, the bankrupt was an innocent purchaser for value and without notice of the lien from Brewer and Spink, and hence not affected by it.

Whether the vendor's lien was or not expressly waived depends upon what was the effect of the conversation between Seay and Brewer and Spink and their attorney, Mallory. The first expressed purpose of Seay was to have the purchase money secured by mortgage.

In this respect Seay's conduct differed from the outset from that of Wyatt, who never demanded security of any kind. Spink and Brewer objected to giving Seay a mortgage, because it would interfere with their handling the property as they desired to do. They desired to operate the mill and cut the timber, either personally or through a corporation to be owned and controlled and managed by them. Their idea was that a mortgage would interfere with the cutting of the timber and its transfer to a corporation organized by them for that purpose. Seay was willing to permit them to cut the timber, and also to operate through a corporation, and was willing to risk the promise of Brewer and Spink not to sell the timber rights to innocent purchasers. He wanted all protection consistent with conferring these rights. This is shown by his inquiries addressed to Mallory. Mallory assured him that the notes and deed as drawn, and without express retention of lien, would protect him as between the original parties as in case of a resale, except as against innocent purchasers. On this assurance, Seay consented to and did execute the deed. Mallory testifies that the assurance was repeated to Seay by him at Seay's request after the conversation in the hall on which the trustee relies as constituting the waiver, and that only after its repetition did Seay execute the deed. This shows conclusively that the extent of the waiver, as understood by Seay up to the time he signed the deed, was that it operated only as to innocent purchasers, and that he then intended to insist on his lien as between the original parties, with the exception of the right to cut timber on the part of such purchasers or a corporation to be formed by and composed of them to operate the mill.

The trustee also contends that the evidence shows a waiver implied from the communication to Seay by the purchasers of their intention to put the property in a corporation to be organized by them, and relies upon the cases of Hubbard v. Buck, 98 Ala. 440, 13 South. 364, and Scheer v. Agee, 106 Ala. 139, 17 South. 610. The conveyance of real estate to purchasers, who, with the knowledge and consent of the seller, buy for the purpose of reselling to third persons, free from incumbrances, is inconsistent with a purpose on his part to retain a vendor's lien, and is an implied waiver of such lien. The inconsistency lies in the fact that the retention of lien would be dishonest to the subpurchaser, and the original purchaser will be presumed not to have intended such a result. If the express object of the vendee in making the purchase would be either to defeat the vendor's lien or defraud the subpurchaser, the vendor will be held to have waived his lien, rather than to have intended to have defrauded the subpurchaser. If Brewer and Spink had communicated to Seay an intent to dispose of the property to third persons, free of liens, Seay's assent to the sale, under such circumstances, would have implied a waiver of his lien. A fair construction of the evidence, however, is that the only indicated disposition of the property was to a corporation, to be organized by and composed exclusively of Brewer and Spink. Retention of lien as against a corporation subpurchaser, which was composed of and owned solely by the original purchasers, would

be entirely fair and not inconsistent with the transaction contemplated. That this was the only intent communicated to Seay by Brewer and Spink is clear from what was afterwards done by them. They organized a corporation to take over the property and operate the mill, in which the sole stock ownership was vested in them in person and through the nominal ownership of their wives. In this respect this case is to be distinguished from those relied on by the trustee, in which the intent was to reconvey so as to cause a change of ownership, while, here, no change of ownership was intended; the ownership remaining identical before and after the reconveyance.

The trustee also contends that the bankrupt took the timber rights for a valuable consideration and without notice of Seay's lien. and is an innocent purchaser for value thereof. The satisfaction of Brewer's and Spink's stock subscription by the conveyance constituted the bankrupt a purchaser for value of the property so conveyed. Brewer and Spink had actual knowledge that the timber rights had not been paid for. Is their knowledge imputable to the bankrupt? In the transaction by wihch the bankrupt acquired the timber rights from Brewer and Spink and parted with 90 shares of its stock therefor, the bankrupt was represented by Brewer and Spink, who also acted for themselves as individuals. If the beneficial ownership of the entire capital stock had not been vested in Brewer and Spink at the time of the transaction, their knowledge of the lien, acquired before the transaction (their interest in the transaction being adverse to that of the bankrupt) might not have been imputed to the bankrupt. On the contrary, it appears that Brewer and Spink subscribed and paid for all the stock issued by the bankrupt, up to the time of the conveyance; the ownership of their wives being nominal and in the interest of their husbands. Every stockholder at the time of the transaction had notice of the lien, as did the managing officers, Brewer and Spink. They were the corporation, and their actual knowledge was that of the corporation. As Spink and Brewer were the sole owners of the capital stock of the corporation, as well as of the property conveyed to it, it can with no propriety be said that their interest, as individuals, was adverse to that of the corporation, which they exclusively owned. So long as this identity of ownership continued there could be no adverse interest. If others than they had owned stock in the bankrupt corporation, at the time of the conveyance, the cases of Frenkel v. Hudson, 82 Ala. 158, 2 South. 758, 60 Am. Rep. 736, and Union Central Life Insurance Co. v. Robinson, 148 Fed. 358, 78 C. C. A. 268, 8 L. R. A. (N. S.) 883, would have been controlling. As it is, this case is more nearly analogous to and governed by the cases of First National Bank of Gadsden v. Winchester, 119 Ala. 168, 24 South. 351, 72 Am. St. Rep. 904, and Lea v. Iron Belt Mercantile Co., 147 Ala. 421, 42 South. 415, 8 L. R. A. (N. S.) 279, 119 Am. St. Rep. 93. The issue as to whether the bankrupt had notice of the lien is to be determined by the status of the corporation as to stock ownership at the time of the transaction. Those who might acquire shares of stock thereafter, either by transfer or subscription, would be in no sense innocent purchasers, and would acquire an interest in

the assets of the corporation in the condition they were in at the time they acquired the stock. Owners of real estate on which exists a vendor's lien cannot escape such lien by incorporating themselves and transferring the incumbered property to a corporation of which they are the sole owners.

This conclusion entitles Seay to a vendor's lien on the timber rights to the extent of the unpaid purchase money owing by Brewer and Spink, subject to any prior lien held by the Union Bank & Trust Company. It is conceded that Seay is not entitled to an attorney's fee.

The trustee attacks the execution of the mortgage given by the bankrupt to the Union Bank & Trust Company because its execution was not authorized at a meeting of the stockholders in pursuance of the Alabama statute. The Supreme Court of Alabama has construed the statutory requirements to be for the exclusive benefit of the stockholders, of the absence of which they alone can complain. Nelson v. Hubbard, 96 Ala. 238, 11 South. 428, 17 L. R. A. 375. There has been an adjudication of the bankrupt, which, for all purposes of this proceeding, establishes conclusively its insolvency. The trustee represents its creditors only, and in this capacity, representing creditors and not stockholders, cannot assert the invalidity of the mortgage for reasons which the stockholders alone can complain of. The Supreme Court of Alabama has also construed this statute as requiring the mortgagor to do equity by offering to return the loan before being permitted to attack the execution of the mortgage in a court of equity, and the bankrupt court, being a court of equity, will follow this rule. Southern Bldg. & Loan Ass'n v. Casa Grande Stable Co., 128 Ala. 624, 29 South. 654.

The proceeds of the loan were placed to the credit of the bankrupt by the bank. Of the proceeds the sum of $770.63 were applied to the payment of unsecured notes of the bankrupt, then outstanding, and one of which was not due. As the bank had the legal right, under section 68a (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3450]), after bankruptcy, to set off against the deposit the notes due it from the bankrupt, the doing it before bankruptcy would not amount to a preference, unless the loan, the proceeds of which constituted the deposit, was made with the prior understanding that such application was to be made. New York County Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380; West v. Bank of Lahoma, 16 Am. Bankr. Rep. 733, 16 Okl. 328, 85 Pac. 469. The resolution of the directors of the bankrupt, which was furnished the bank before the loan was made, clearly shows the purpose of the loan to have been, in part, to pay off the existing indebtedness due the bank. The recital is:

"Said money to be used to retire notes now held by said bank and to meet the obligations of the company."

As the bank obtained the deposit by this agreement, its subsequent application of the deposit to the loan, pursuant thereto, clearly constitutes a preference, providing the bankrupt was insolvent when the loan was made and the bank had reasonable grounds for believing a preference was intended.

The bankrupt corporation was organized shortly before the loan was made to it by the bank. Its assets consisted, so far as the record shows, of the property conveyed to it by Spink and Brewer in payment of their stock subscription. For this property they paid $4,900, and it was incumbered by a vendor's lien of $3,500, leaving an equity of $1,400 in the bankrupt. The record shows that the bankrupt on January 6, 1910, the date of the $2,000 loan, owed the bank $774.63, and executed on that day to the bank a renewal note for $557.25, on what is testified to have been a separate transaction for money previously borrowed. It also owed the witness Ryan $25 and the witness Spink $650, which was paid from the proceeds of the loan. These amounts aggregate $2,006.88. The witness Spink also testifies that the proceeds of the $2,000 was used up in paying debts of the bankrupt in accordance with the purpose expressed in the resolution of the bankrupt's board of directors. From this it may be reasonably inferred that the obligations of the company exceeded its free assets at the time of the $2,000 loan.

Did the bank have reasonable grounds to believe that the bankrupt intended to prefer it by taking up the unsecured notes with proceeds of the note secured by mortgage?

The loan was authorized on January 6, 1910, at a meeting of the directors of the bankrupt. The resolution of the directors authorizing the loan recited that the purpose of the loan was to take up the outstanding obligations of the bankrupt, including those due the bank, and this resolution was furnished to the bank before the loan was made. The mortgage included all the assets of the bankrupt, and left its other creditors without means of satisfying their claims, except from the proceeds of the loan. The mortgage, though executed January 6, 1910, was withheld from record until April 8, 1910, two days after the note, which it secured, fell due and was dishonored. On January 6, 1910, a stockholders' meeting of the bankrupt corporation was held, which meeting Ector H. Smith and Enos R. Stewart attended in person, voting each 14 shares of stock. At a directors' meeting held the same day, Ector H. Smith and Enos R. Stewart were present in person and voted for the election of Stewart as treasurer of the bankrupt company. On March 10th Ector H. Smith was, by a vote of all the directors except Smith, who was present, appointed agent for the bankrupt with complete authority to manage its affairs and with a monthly salary of $100, payable when the finances of the company permitted. Ector H. Smith was president and Enos R. Stewart vice president of the Union Bank & Trust Company, and were the two officers of the bank with whom Spink dealt in negotiating the loan for the bankrupt. These facts were sufficient to charge the bank with notice of the insolvency of the bankrupt and its intent to prefer the bank by taking up the unsecured indebtedness due it from the bankrupt.

My conclusion is that the bank was preferred to the extent of $774.63 and is entitled to a lien only for the balance. This being a proceeding in which the bank seeks only to establish its lien, secured by its mortgage, and not to prove its claim against the general assets

of the estate, the bank is not required to surrender its preference, as a condition of asking the court to recognize its lien on the mortgaged property, and to receive payment from the proceeds thereof. On the other hand, the bankrupt court being a court of equity, the trustee is not required to pay the bank the full amount of its mortgage and then institute a plenary suit to recover the amount of the preference. The bank having submitted to the jurisdiction of the court upon this summary petition, the court has the right under it to finally and completely settle all the equities between the parties to it, without requiring the trustee to resort to a plenary suit to recover the preference.

The record fails to show that the note was placed in the hands of an attorney for collection before the petition in bankruptcy was filed. The attorney's fee is not, therefore, a part of the bank's provable claim. In re Keeton (D. C.) 11 Am. Bankr. Rep. 370, 126 Fed. 429. It is contended that, though not a provable claim against the general assets of the bankrupt, it is a part of the secured claim, payment of which should be enforced through the mortgage lien. The provision in the note for an attorney's fee may be availed of in a proceeding to foreclose the lien of the mortgage. Johnson v. Durner, 88 Ala. 580, 7 South. 245; Bailey v. Butler, 138 Ala. 153, 35 South. 111. If the mortgagee had proceeded to enforce the mortgage by foreclosure, its right to an attorney's fee by virtue of the provision in the note, as well as that of the mortgage itself, would have been clear. The present proceeding was instituted by the trustee. Its purpose is to sell the assets of the bankrupt, free from liens. As a necessary incident, the court must determine the validity of the claimed liens, and to that end has summoned the lienees to assert their claimed liens. The only issues presented are: (1) The validity of the claimed liens; and (2) the advisability of a sale free from liens. The bank appears in the proceeding, not for the purpose of collecting its note, the validity and amount of which is not a subject of contest in this proceeding, nor for the purpose of foreclosing its mortgage by a sale of the property, but solely for the purpose of asserting that it has a valid lien on the property, the sale of which, free from liens, is sought by the trustee. The services rendered the bank by its attorney in this matter have in view neither the collection of the note nor the foreclosure of the bank's lien, but solely the establishment of its lien. If the relief asked by the trustee is granted, the trustee will sell the property at his sole expense, and without the bank's attorney having rendered any service in securing or conducting the sale. The bank will receive its part of the proceeds from the trustee, without expense or effort on its part or that of its attorney, except such as is directed towards showing the validity and amount of its lien. Service rendered to this end can in no just sense be said to have been rendered either in collecting the note or foreclosing the mortgage. If no services of either kind were rendered the bank by its attorney, the bank has no just claim under the terms of its note and mortgage to an allowance of reasonable attorney's fees. The bank would not be entitled to an attorney's fee for the services of its attorney rendered to it in a suit against it in the state court in equity, to quiet the title and remove the mortgage as a

cloud on it, in which the only issue was as to the validity of the mortgage, in which no affirmative relief by way of foreclosure was asked, and in which only a decree declaring the mortgage to be a valid lien could be obtained. A judgment upon the note or a decree foreclosing the mortgage is indispensable to the allowance of an attorney's fee by the very terms of the note and mortgage. The record fails to show services performed within the provisions of either note or mortgage.

In view of the condition of the incumbrances on the Seay and Wyatt property, it seems best that they should be sold separately and free from liens. The bank's lien, having priority on both lots of property, should be paid pro rata on the basis of valuation from the proceeds of the sale of each. The bank or its receiver is authorized to bid such pro rata part of the amount of its lien on either of both lots as cash. Seay is authorized, by paying the pro rata part of the bank lien on the Seay lot in cash, to use the amount of his vendor's lien pro tanto in payment of the balance instead of cash. The trustee has the option of surrendering the Seay property to the lienees, instead of selling it under the terms of this order, and, in that event, the bank's lien will attach to this property on the same pro rata basis.